02-11-431-CV












 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.
02-11-00431-CV

 

 


 
 
 MBR
 & Associates, Inc. and Marion Brian Ramon
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 William S. Lile
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

FROM THE 352nd District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

Appellants
MBR & Associates, Inc. and Marion Brian Ramon
appeal from the trial court’s judgment for Appellee William S. Lile, signed after a bench trial.  For the reasons set
forth below, we will affirm the trial court’s judgment.

II.  Factual Overview

         
Lile hired MBR Guaranteed
Foundation Repair (MBR-GFR)[2] to repair the foundation of his home
based on MBR-GFR’s representations that the company
had master plumbers and engineers on staff, that the company had liability
insurance to cover his property in the event of any damage to his property, and
that a master plumber and engineer would oversee the job at his house. 
Ramon instructed the salespersons involved in obtaining Lile’s
contract to make these representations.  Each of these representations was
false.  A forged and fake copy of a certificate of liability insurance was
included in MBR-GFR’s sales packet.

When
MBR-GFR performed the “mudjacking”
procedure on Lile’s home, its workers negligently
lifted the foundation too high, causing multiple fractures in the foundation
and causing the sewer system pipes to crack and pull loose from sewer pipes in the
foundation.  No engineer or master plumber was supervising the job. 
The sewer system was filled with mudjacking concrete,
which the workers did not notice until it was coming up through the toilet bowl
in one bathroom, the drain of one bathtub, and the toilet opening in another
bathroom.  Upon discovering the mudjacking
concrete rising through Lile’s home’s sewer system,
the MBR-GFR workers
left.  Eventually, MBR-GFR
sent Douglas Provenzano to Lile’s
home to attempt to clean the now-hardened mudjacking
concrete out of sewer system pipes at Lile’s
house.  Provenzano represented himself to be—but
was not—a master plumber.  Provenzano jackhammered five holes into Lile’s
foundation inside his house looking for the main sewer line but could not find it.  Ramon told Lile
that he had liability insurance but that he was not going to turn in a claim
because what had happened was not his fault and that he was not going to do
anything further to help Lile.  Appellants[3] then abandoned all efforts to complete or
repair Lile’s foundation.  The mudjacking concrete injected into Lile’s
sewer system remained there through the date of trial.  Lile’s sewer system was inoperable, and his home was
uninhabitable.

Lile
asserted causes of action against Appellants for breach of contract,
negligence, violations of the Deceptive Trade Practices-Consumer Protection Act
(DTPA), fraud, and gross negligence.  The trial
court’s findings of fact indicate that the trial court found for Lile on each element of each of these causes of
action.  The trial court found that the conduct of Appellants, including
Ramon individually, was a direct, proximate, and producing cause of extreme
emotional distress to Lile; he suffered physical
illnesses—such as upset stomach, headaches, high blood pressure, depression,
bouts of crying, loss of sleep, and loss of appetite.  The trial court
also found that this extreme emotional anguish has been constant, consistent,
and ongoing on a daily basis since the mudjacking
procedure occurred.  The trial court awarded Lile
the same amount of damages for each of his causes of action—including breach of
contract, negligence, violations of the DTPA, and
fraud.  The total damages awarded included $2,000.00 for loss of the
benefit of the bargain; $132,469.04 for the reasonable and necessary costs to
repair Lile’s house; $69,150.00 for temporary housing
during the loss of the use of his house; $1,967.04 for reasonable and necessary
mitigation expenses incurred by Lile in protecting
his property from damage; $250,000.00 for mental anguish sustained by Lile in the past; and $50,000.00 for mental anguish damages
which in reasonable probability will be sustained by Lile
in the future.  These damages were awarded against MBR
& Associates, Inc. and Ramon, jointly and severally.

III.  Standard of Review When Trial Court Issues Findings of Fact

Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury’s answers to jury questions.  Anderson v. City
of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991). 
In a bench trial, the trial court, as factfinder, is
the sole judge of the credibility of the witnesses.  Sw.
Bell Media, Inc. v. Lyles, 825 S.W.2d 488, 493
(Tex. App.—Houston [1st Dist.] 1992, writ denied).  If a complete
reporter’s record exists in an appeal, the trial court’s findings of fact are
challengeable for legal and factual sufficiency of the evidence to support them
by the same standards that are applied in reviewing evidence supporting a
jury’s finding.  See Catalina v. Blasdel,
881 S.W.2d 295, 297 (Tex.
1994).  But unchallenged findings of fact are binding on an appellate
court unless contrary findings are established as a matter of law or no
evidence supports them.  Milton M. Cooke Co. v. First
Bank & Trust, 290 S.W.3d 297, 303 (Tex. App.—Houston [1st Dist.] 2009,
no pet.) (citing McGalliard v. Kuhlmann,
722 S.W.2d 694, 696 (Tex. 1986)).  Conclusions
of law are not challengeable for factual sufficiency, but they may be reviewed
to determine their correctness based upon the facts.  Rogers
v. City of Fort Worth, 89 S.W.3d 265, 277 (Tex. App.—Fort Worth 2002, no
pet.).  A challenge to fact findings that form the basis of a
conclusion of law or disposition will be overruled when the appellant does not
challenge other fact findings that support that conclusion or
disposition.  Milton M. Cooke Co., 290 S.W.3d at 303; Raman
Chandler Props., L.C. v. Caldwell’s Creek Homeowners Ass’n,
Inc., 178 S.W.3d 384, 397 (Tex. App.—Fort Worth 2005, pet. denied); see
also Oliphant Fin. L.L.C. v. Hill, 310 S.W.3d 76,
77 (Tex. App.—El Paso 2010, pet. filed) (explaining that an appellant must
attack all independent bases or grounds that fully support a complained-of
ruling or judgment, or appellate court must affirm judgment or ruling).

Here,
following the bench trial, the trial court issued 215 findings of fact and 33
conclusions of law comprising 39 pages in the clerk’s record.  Appellants,
in their brief, do not challenge any specific finding of fact or conclusion of
law.  Additionally, although Appellants raise nine issues,[4] many of their issues do not articulate
alleged error by the trial court, and none of them set forth the standard of
review that Appellants desire this court to apply.  The argument portions
of Appellants’ brief on the issues raised by Appellants that generically query
whether the trial court’s findings are supported by “sufficient evidence” or
whether Lile presented “sufficient evidence” do not
identify any specifically challenged findings of fact, do not set forth a
standard of review, and do not purport to analyze the evidence in the 11-volume
reporter’s record, the 278 exhibits, or the 6-volume clerk’s record contained
in this appeal as it relates to any finding of fact.

During
oral argument, the court questioned Appellants’ counsel regarding the
unchallenged findings of fact.  Following oral argument, Appellants filed
a motion requesting to file, and we allowed Appellants to file, a supplemental
brief setting forth the relevant findings of fact challenged in each of the
issues raised in their appellate brief without any further analysis or
additional issues.  Because Appellants filed a supplemental brief listing
the relevant findings of fact challenged in each of the issues they raised, we
will address the issues necessary for final disposition of this appeal.  See
Tex. R. App. P. 47.1. 

IV.  Proper Measure of Real Property Damages

         
In their first issue, Appellants claim that Lile can
recover only diminution in value damages.  Appellants base their argument
on their conclusion that the damage to Lile’s
property involved a permanent injury because the cost to repair exceeded the
decrease in market value of the property.  Appellants further argue that
due to the permanent injury to Lile’s property, he
cannot recover loss of use damages.

         
When, as here, damage to real property is involved, the correct measure of
damages is a fact-specific inquiry.  Hall v. Hubco, Inc., 292 S.W.3d 22, 32 (Tex. App.—Houston [14th
Dist.] 2006, pet. denied).  If repair is feasible and does not
cause economic waste, then the plaintiff may recover the cost of repair;
otherwise, the plaintiff is entitled to the decrease in market value caused by
the injury.  See id.; Samuel v. KTVU P’ship,
No. 08-02-00010-CV, 2003 WL 22405384, at *1 (Tex. App.—El Paso Oct. 22, 2003,
no pet.) (mem. op. on reh’g) (“Texas courts have
recognized that the proper measure of damages when the injury to realty is
repairable is the reasonable cost of repairs necessary to restore the property
to its prior condition.”). 

         
Here, Lile testified that the fair market value of
his home when it was in good condition was $165,000 to $170,000.  There
was no evidence offered regarding the decrease in the fair market value of Lile’s home after it was damaged.  Based on the
stipulation of the parties and on the testimony of Lile’s
expert Robert Nicholas, the trial court found that the reasonable and necessary
cost to repair Lile’s home to rental status was
$132,469.04.[5] 
Measuring the $132,469.04 cost to repair to rental status against the fair
market value of $165,000 to $170,000 (because there was no evidence of the
decrease in the fair market value of Lile’s home), it
is clear that the cost to repair to rental status is less than the home’s fair
market value.  Lile thus proved that the house
could be repaired to rental status without economic waste and that he is
therefore entitled to cost of repair damages.  See Coastal Transp. Co.
v. Crown Cent. Petroleum Corp., 136 S.W.3d 227,
235 (Tex. 2004) (holding that Crown Central was entitled to recover amount
necessary to rebuild its facility because evidence at trial supported jury’s
finding that Crown Central could rebuild its facility to its former condition;
market value damages were unavailable because cost to rebuild damaged property
was significantly less than the decrease in market value caused by damage);
Control Solutions, Inc. v. Gharda USA, Inc., No.
01-10-00719-CV, 2012 WL 3525372, at *35 (Tex. App.—Houston [1st Dist.] Aug. 16,
2012, no pet. h.) (holding that CSI was entitled to
recover the amount necessary to rebuild its facility and to compensate for its loss
of use during the interim time period because testimony established that
property was not a total loss and was rebuilt for less than its value).[6]

         
Lile was not required to prove both cost of repair
and diminution in value; he, instead, had an election of which measure of
damages to plead or prove.  See Miller v. Dickenson,
677 S.W.2d 253, 258 (Tex. App.—Fort Worth 1984, writ
ref’d n.r.e.).  The record is clear that Lile elected to proceed under the cost of repair measure of
damages.  If Appellants disagreed with the application of the cost of
repair measure of damages, they had the burden of proving that the diminution
in value was a smaller sum.  See id.  Appellants, however, do
not point us to any evidence in the record of the diminution in value.

         
Appellants instead attempt to argue that economic waste would occur by awarding
Lile cost of repair damages because Lile’s expert Robert Nicholas testified that it would cost
more to fix the house than what it would be worth.  In their reply brief,
Appellants set forth the relevant trial testimony from Nicholas, including his
opinion that the house could be repaired to a state that it would be
presentable as rental or investment property.[7]  Nicholas’s report, which was
admitted into evidence, is consistent with his trial testimony and contains the
following conclusion:

Based on my inspections, I believe that the house can be
salvaged.  The foundation and plumbing will require extensive repairs and
completely leveling the foundation is probably not feasible.  After
renovations, the house would be considered more in the rental property category
rather than primary residence.  The renovation will include adding new
steel piling, re-shimming some of the existing steel pilings, repairing or
replacing the sewer system, backfilling the openings in and around the
foundation, patching the holes in the slab, instilling the gyp-board on the
interior and finishing out the interior with new paint and texture, new
floorings, new fixtures and new cabinets.

         
Based on the evidence presented at trial, including Nicholas’s testimony and
his report, the trial court made finding of fact 110:

The condition of the foundation cracks inside the house
and the foundation could be permanently repaired, but the costs would exceed
the value of the Lile house.  The cracks could
be epoxied, but then the Lile
house would be suitable only as a rental house, because a homeowner would not
reasonably be expected to live in a house with a foundation in this condition,
but Lile intends to live in the house after it is
repaired. 

As
demonstrated by the expert’s testimony and report and as summarized in finding of
fact 110, this is a unique situation in which Lile,
the homeowner, wanted to be back in his house so badly that he was willing to
have it repaired to a rental property status at a cost less than the fair
market value of the home, rather than have it repaired to a homeowner status at
a cost that would exceed the fair market value of the home.  Because Lile elected to pursue the cost of repair damage model;
because the only evidence of the fair market value of Lile’s
home was his testimony that it was worth $165,000 to $170,000 in good
condition; because the evidence supported the $132,469.04 cost of repair to
rental status, which was comprised of $105,864.00 of costs to repair the
interior, plus $38,000.00 of costs to repair the sewer lines, less $11,394.96
of costs that were available for buildback; because
the $132,469.04 cost of repair to rental status was less than the $165,000 to
$170,000 value of the home; and because there was no evidence of diminution in
value measure of damages; the trial court did not err by awarding Lile cost of repair to rental status damages.  See
Coastal Transp. Co., 136 S.W.3d at 235; Control Solutions, Inc.,
2012 WL 3525372, at *35.  We therefore overrule Appellants’ first issue.

V.  Vicarious and Individual Liability

         
In the fifth issue, Ramon argues that the trial court erred by finding him
vicariously liable for the acts of MBR &
Associates, Inc.  Ramon challenges the trial court’s findings that MBR-GFR is the trade name of
Ramon and that Ramon is the alter ego of MBR &
Associates, Inc.  Lile responds that Ramon d/b/a
MBR-GFR is the alter ego of
MBR & Associates, Inc. 

         
A corporation is a separate legal entity that normally insulates its owners or
shareholders from personal liability.  Schlueter
v. Carey, 112 S.W.3d 164, 169 (Tex. App.—Fort Worth 2003, pet.
denied).  The corporate fiction is disregarded based on alter ego,
however, when a corporation is organized and operated as a mere tool or
business conduit of another.  Id.  An alter ego relationship
may be shown from the total dealings of the corporation and the individual,
such as evidence of the degree to which corporate and individual property have
been kept separate; the amount of financial interest, ownership, and control
the individual has maintained over the corporation; and whether the corporation
has been used for personal purposes.  Id. (citing Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990)).  In a tort case, the
financial strength of the corporate tort-feasor is an
important consideration.  Id. (citing Lucas v. Tex. Indus., Inc.,
696 S.W.2d 372, 375 (Tex. 1984)).  If the
corporation sued is not reasonably capitalized in light of the nature and risk
of its business, the need might arise to attempt to pierce the corporate
veil.  Id.

         
Here, the trial court made numerous findings of fact related to its
determination that Ramon was the alter ego of MBR
& Associates, Inc., and the record supports the trial court’s findings.
 Our review of the record reveals that Ramon testified that he treated MBR & Associates, Inc. and MBR-GFR as “one in the same” and agreed when asked if “[a]ll of you are just one entity, right?”  The two
entities shared the same phone number and office, and MBR-GFR did not file a separate tax return, nor did it have its
own federal tax identification number.  Ramon owned 100% of MBR & Associates, Inc. and was the president and CEO of
MBR-GFR.  The
individuals who worked on Lile’s house under the
auspices of MBR-GFR were
paid with checks written on MBR & Associates,
Inc.’s account.  Of the alter ego findings of fact that the trial court
made, Ramon does not challenge finding of fact 190, in which the trial court
found that MBR & Associates, Inc. has no
employees, assets, equipment, vehicles, telephone number, or business office
address, yet it pays all bills for MBR-GFR, carries all MBR-GFR employees and workers as the corporation’s employees
and workers for banking and income tax purposes, and accepts all accounts
receivable to MBR-GFR.
 Nor does Ramon challenge finding of fact 191, in which the trial court
found that MBR & Associates, Inc. owned a house
valued at $1.8 million on Joe Pool Lake, a house in which Ramon and his family
live and that was transferred out of the corporation’s name shortly before the
trial. 

         
Analyzing the factors from Schlueter that are
set forth above—including that Ramon’s individual property was not kept
separate from the corporation’s, that the corporation was used for the personal
purpose of holding Ramon’s home, and that Ramon was the sole shareholder and
owner of MBR & Associates, Inc.—the evidence
supports the trial court’s findings of fact and the correctness of its
conclusions of law that Ramon and MBR &
Associates, Inc. are alter egos of one another.  See 112 S.W.3d at
169 (holding evidence legally sufficient to support trial court’s finding that Schlueter was Entertainment Properties’s
[EP’s] alter ego because evidence showed that Schlueter
owned all of the stock of EP, was one of its two officers, and referred to
himself and EP interchangeably during testimony).  We hold that the trial
court therefore did not err by finding Ramon vicariously liable for the acts of
MBR & Associates, Inc.

         
In the alternative, as Lile argued in his brief, the
judgment in this case would not change even if the trial court had erred by
making its trade name and alter ego findings because the trial court found
Ramon individually liable for fraud and DTPA
violations. 

         
The DTPA creates a cause of action when a consumer
suffers from “[f]alse, misleading, or deceptive acts
or practices in the conduct of any trade or commerce.”  Tex. Bus. & Com. Code Ann. § 17.46(a) (West 2011).  Such
“acts or practices” include “representing that goods or services have . . . characteristics . . . which they do not
have.”  Id. § 17.46(b)(5); see Commonwealth Lloyds Ins. Co.
v. Downs, 853 S.W.2d 104, 116 (Tex. App.—Fort
Worth 1993, writ denied). Moreover, “there can be
individual liability on the part of a corporate agent for misrepresentations
made by him.”  Weitzel, 691 S.W.2d at 601.

         
Here, Frank Creed, who worked for MBR-GFR, testified that Ramon trained him and instructed him to
represent to potential customers that MBR-GFR had master plumbers and engineers that would oversee
the job and that MBR-GFR
had liability insurance.  Ramon testified that he had not told anyone to
make such representations; he agreed that any such representations were not
true. The record, however, contains evidence of
statements made by Ramon—that is, that he instructed Creed to represent to
potential customers that MBR-GFR
had master plumbers and engineers that would oversee the job and that MBR-GFR had liability
insurance—upon which the trial court could have relied in concluding that Ramon
had made oral misrepresentations.  Such evidence supports the trial
court’s findings of fact that Ramon is personally liable for the
misrepresentations that he made.  

         
We therefore alternatively hold that even if the trial court’s trade name and
alter ego fact findings are supported by insufficient evidence, the evidence
supports the trial court’s findings that Ramon was individually liable for the
misrepresentations that he made in violation of the DTPA. 
See id. (upholding individual liability on part of two corporate
officers because record contained evidence of statements of both men that
supported trial court’s findings that each had made oral misrepresentations
that were actionable under DTPA).  Thus, the
judgment against Ramon individually is supportable based not only on the trial
court’s trade name and alter ego findings but also, alternatively, based on the
trial court’s findings supporting DTPA violations by
Ramon himself. 

         
We overrule Appellants’ fifth issue.

VI.  Evidence Established
that Misrepresentations
were Producing
Cause of
Lile’s Damages

 

         
In their sixth issue, Appellants argue that Lile
failed to establish the proximate cause element of his fraud and DTPA claims.  Appellants do not provide a single
citation to the record in support of their arguments on this issue.  We begin with Lile’s
DTPA cause of action.

         
To prevail on a DTPA claim, a plaintiff must prove
that the defendant’s misrepresentation was the producing cause of the
plaintiff’s injuries.  Tex. Bus. & Com. Code Ann.
§ 17.50(a) (West 2011); Alexander v. Turtur &
Assocs., Inc., 146 S.W.3d 113, 117 (Tex. 2004); Main Place Custom Homes,
Inc. v. Honaker, 192 S.W.3d 604, 616 (Tex. App.—Fort Worth 2006, pet.
denied).  Producing cause requires that the defendant’s acts be both a
cause-in-fact and a “substantial factor in bringing about injury which would
not otherwise have occurred.”  Transcon. Ins. Co. v. Crump, 330 S.W.3d 211, 223 (Tex.
2010) (quoting Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,
896 S.W.2d 156, 161 (Tex. 1995)).  Unlike
proximate cause, producing cause does not require proof of foreseeability. 
See Transcon. Ins. Co., 330 S.W.3d at 223; S & I Mgmt., Inc. v. Choi, 331 S.W.3d 849, 856
(Tex. App.—Dallas 2011, no pet.).  The plaintiff must
also prove that it relied on the defendants’ misrepresentation to his
detriment.  Tex. Bus. & Com. Code Ann.
§ 17.50(a)(1)(B).

         
As set forth above, Lile was not required to prove
proximate cause, only producing cause, with respect to his DTPA
claim.  Appellants, in their initial brief, failed to challenge the
producing cause element of Lile’s DTPA
cause of action, raising producing cause only in their reply brief. 
Because the trial court awarded the same damages under Lile’s
DTPA and fraud causes of action,[8] if we determine that Lile
established the producing cause element of his DTPA
claim, we need not address Appellants’ proximate cause challenge to Lile’s fraud claim.

         
During the bench trial, Lile testified that Creed
told him that MBR-GFR
carried liability insurance and had a master plumber and an engineer that would
be overseeing the work on Lile’s home.  Lile glanced at the sales packet that Creed showed him,
including what appeared to be a certificate of liability insurance, and
testified that Creed’s representation that MBR-GFR carried liability insurance was important to him.
 It was also important to Lile that a master
plumber and an engineer would be overseeing the work.[9]  Lile
relied on Creed’s representations and said he would not have allowed workers
from MBR-GFR to “step foot
on” his property if he had known that MBR-GFR did not have insurance to cover damage to his
property.  Prior to this incident, Lile did not
have knowledge of how the foundation industry operated, had never watched a
foundation be repaired, and had no knowledge of the pitfalls in lifting a
foundation.  Lile trusted the representations
made by Creed about liability insurance and supervision of the work by a master
plumber and engineer; in addition, Creed represented that he was going to do a
good job and was going to “fix [Lile’s foundation]
where [Lile] couldn’t tell it had ever been
repaired.”  

         
This evidence factually supports the trial court’s conclusion that but for
Appellants’ misrepresentations, Lile would not have
incurred the mudjacking damages in connection with
his property.  See Main Place Custom Homes, Inc., 192 S.W.3d at
619–20 (holding that homeowners’ DTPA claims were
based on the causal connection between construction company’s owner’s
misrepresentations and their damages); see also Choi,
331 S.W.3d at 856 (holding that there was some evidence of DTPA
causation because there was testimony that broker’s representations about a
vacant gas station remaining vacant were a substantial factor in appellant’s
purchasing the businesses and that appellant would not have purchased the
businesses if the broker had told him that Quiktrip
was moving into vacant gas station).  We therefore hold that the record
contains legally and factually sufficient evidence of the producing cause
element of Lile’s DTPA
claim.  See Carpenter v. Holmes Builders, Inc., No.
11-02-00132-CV, 2004 WL 306130, at *7 (Tex. App.—Eastland Feb. 19, 2004, pet.
denied) (order and mem. op.) (holding
that evidence was legally and factually sufficient to support determination
that appellee’s DTPA
violations were a producing cause of appellants’ damages because appellee deficiently selected slab-on-grade foundation for
appellants’ home despite soil report stating that slab-on-grade floor system
should not be used due to excessive shrink/swell movement potential of high
plasticity clays found at site).  We overrule Appellants’ sixth issue.

VII.  Mental Anguish Damages Are Recoverable

         
In their third issue, Appellants argue that Lile
cannot recover mental anguish damages in a suit based solely on damage to real
property.  Appellants rely on City of Tyler v. Likes, 962 S.W.2d 489 (Tex. 1997), in arguing that the supreme court
has held as a matter of law that mental anguish damages are not recoverable for
a claim involving damages to real property.

         
Appellants fail to acknowledge that the supreme court in Likes
specifically noted that “mental anguish based solely on negligent
property damage is not compensable as a matter of law” and that “[b]ecause the injury to Likes’s
property was not intentional or malicious, or even grossly negligent, we need
not decide whether mental anguish arising out of property damage may be legally
compensable when a heightened degree of misconduct is found.”  Id.
at 497 (emphasis added).  Likes specifically
states that mental anguish damages are recoverable for some common law torts
that generally involve intentional or malicious conduct such as libel, battery,
and by analogy, for knowing violations of certain statutes such as the DTPA.  Id. at 495; see also Tex.
Bus. & Com. Code Ann. § 17.50(b)(1)
(permitting award of mental anguish damages on a DTPA
claim if the trier of fact finds that the conduct of the defendant was
committed “knowingly”); Luna v. N. Star Dodge Sales, Inc., 667 S.W.2d 115, 117 (Tex. 1984) (holding that a DTPA plaintiff may recover mental anguish damages when
there is proof of a willful tort, willful and wanton disregard, or gross
negligence).  Where a claim of mental anguish is based solely upon
property damage resulting from gross negligence, recovery is contingent upon
evidence of some ill-will, animus, or design to harm the plaintiff personally;
such rationale is more consistent with the general principle that emotional
distress is not usually recoverable as an element of property damages unless an
improper motive is involved.  Accord Seminole Pipeline Co., Mapco, Inc.
v. Broad Leaf Partners, Inc., 979 S.W.2d 730, 757
(Tex. App.—Houston [14th Dist.] 1998, no pet.).  Thus, Lile,
as a DTPA plaintiff, may recover mental anguish
damages if he established that Appellants knowingly engaged in conduct that
violated the DTPA. 

         
Here, with regard to whether Appellants knowingly engaged in conduct that
violated the DTPA that would entitle Lile to recover mental anguish damages, the trial court
made numerous findings of fact, some of which Appellants failed to challenge,
related to Appellants’ knowing conduct.  In findings of fact 139, 140, and
151, among others, the trial court found that the conduct of Appellants was
knowing and intentional and rose to the level of gross negligence and malice.
 Appellants, however, challenge only seven of the trial court’s findings
of facts:  71, 129, 134, 138, 152, 153, and 161; they do not challenge
findings of fact 139, 140, or 151 in connection with this issue.  Our
review of the record reveals that these unchallenged findings of fact are
supported by ample evidence in the record.  Because the record supports
the unchallenged findings of fact and because such unchallenged findings of
fact are binding on us, we hold that Lile established
that Appellants knowingly engaged in conduct that violated the DTPA, and thus Lile was entitled
to recover mental anguish damages in connection with his DTPA
claim for Appellants’ knowing conduct.  See Luna, 667 S.W.2d at 117 (holding that jury’s finding—that the
unconscionable actions of a car dealership were committed “knowingly”—was
sufficient to support recovery of mental anguish damages in suit involving DTPA claims); Milton M. Cooke Co., 290 S.W.3d at 303
(citing McGalliard, 722 S.W.2d
at 696).  We overrule Appellants’ third issue.

VIII.  Sufficient
Evidence Exists
to Support
Mental Anguish
Damages

 

         
In their fourth issue, Appellants argue that Lile did
not present sufficient evidence of past or future mental anguish damages. 

A. 
Legal Sufficiency Standard of Review

         
We may sustain a legal sufficiency challenge only when (1) the record discloses
a complete absence of evidence of a vital fact; (2) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence offered to prove a vital fact is no more
than a mere scintilla; or (4) the evidence establishes conclusively the
opposite of a vital fact.  Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied,
526 U.S. 1040 (1999); Robert W. Calvert, “No Evidence” and “Insufficient
Evidence” Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).  In
determining whether there is legally sufficient evidence to support the finding
under review, we must consider evidence favorable to the finding if a
reasonable factfinder could and disregard evidence
contrary to the finding unless a reasonable factfinder
could not.  Cent. Ready Mix Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of
Keller v. Wilson, 168 S.W.3d 802, 807, 827
(Tex. 2005).  Anything more than a scintilla of evidence
is legally sufficient to support the finding.  Cont’l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex.
1996).

B. 
Factual Sufficiency Standard of Review

         
When reviewing an assertion that the evidence is factually insufficient to
support a finding, we set aside the finding only if, after considering and
weighing all of the evidence in the record pertinent to that finding, we
determine that the credible evidence supporting the finding is so weak, or so
contrary to the overwhelming weight of all the evidence, that the answer should
be set aside and a new trial ordered.  Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op.
on reh’g); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965).

C. 
Law on Mental Anguish Damages

         
The supreme court has admonished appellate courts to
closely scrutinize awards for mental anguish damages.  Universe
Life Ins. Co. v. Giles, 950 S.W.2d 48, 54 (Tex.
1997).  An award of mental anguish damages “will survive a legal
sufficiency challenge when the plaintiffs have introduced direct evidence of
the nature, duration, and severity of their mental anguish, thus establishing a
substantial disruption in the plaintiffs’ daily routine.”  Parkway Co. v. Woodruff, 901 S.W.2d
434, 444 (Tex. 1995).  If there is no direct evidence, we apply
“traditional ‘no evidence’ standards to determine whether the record reveals
any evidence of ‘a high degree of mental pain and distress’ that is ‘more than
mere worry, anxiety, vexation, embarrassment, or anger’ to support any award of
damages.”  Id.; see also Latham v. Castillo, 972 S.W.2d 66, 70 (Tex. 1998) (holding that plaintiff’s
testimony—that defendant’s DTPA violations made him
“sick, nervous, [and] mad,” that his “heart was broken,” and that he “felt
physically ill” and vomited—constituted some evidence that defendant’s conduct
caused plaintiff a “high degree of mental pain and distress” that a jury could
consider).  It is not necessary, however, for a party to have suffered any
physical injury to recover damages for mental anguish.  Star Houston v.
Shevack, 886 S.W.2d
414, 418 (Tex. App.—Houston [1st Dist.] 1994), writ denied, 907 S.W.2d 452 (Tex. 1995).  Texas courts have held that
evidence of a claimant’s physical and emotional state, coupled with his
inability to eat and sleep, constitutes legally and factually sufficient
evidence to support the award of mental anguish damages.  See CA
Partners v. Spears, 274 S.W.3d 51, 76–77 (Tex. App.—Houston [14th Dist.]
2008, pet. denied) (citing four cases from throughout Texas).

         
Further, in certain categories of cases, the inherent problems of foreseeability and genuineness associated with mental
anguish damages are largely mitigated.  See Likes, 962 S.W.2d at 495.  These
include some common law torts that generally involve intentional or malicious
conduct such as libel, and by analogy, knowing DTPA
violations.  Id.  

         
Moreover, translating mental anguish damages into dollars is necessarily an
arbitrary process.  Lone Star Ford v. Hill, 879 S.W.2d 116, 121 (Tex. App.—Houston [14th Dist.] 1994, no
writ).  Damages for future mental anguish are recoverable “if there
is a reasonable probability that they will be suffered in the future.”  Lubbock
Cnty. v. Strube,
953 S.W.2d 847, 857 (Tex. App.—Austin 1997, pet.
denied).  In the absence of any objective guidelines, we should
defer to the factfinder’s discretion in determining
mental anguish damages.  Lone Star Ford, 879 S.W.2d at 121.

D. 
Sufficient Evidence to Support Mental Anguish Damages

         
Appellants challenge the following findings of fact in connection with their
fourth issue:

         
Finding of fact 71:

          On
the evening of April 17, 2003, after mudjacking
concrete entered the sewer system, Rosales and crew suddenly loaded their tools
and equipment and left Lile with a house with water
and mudjacking concrete all over the walls and
floors.  Lile was left to try to get the water
mixed with mudjacking concrete off the floor by himself.  He was stunned and shocked by what he had
been told and what he saw.  He mopped awhile, then went outside and walked
around his house and started to cry.  He stayed until early the following
morning mopping water mixed with mudjacking concrete
and crying.  Lile became physically ill, his
blood pressure rose, he could not sleep and he worried about what he and his
family would do, and how he would tell them what had happened.  His house
was destroyed.  He experienced severe mental anguish as a result of this
occurrence.  He had just had the mold removed from inside his house and
now his house had water mixed with mudjacking
concrete on the walls and floors.

         
Finding of fact 129:

         
The conduct of Defendant was a direct, proximate and producing cause of extreme
emotional anguish which Lile has suffered since April
17, 2003.  He has suffered severe anxiety and worry about how he and his
family will continue to survive with a house that is paid for, but
uninhabitable; he suffers from physical illness such as upset stomach and
headaches; he suffers from high blood pressure; depression; bouts of crying;
loss of sleep; loss of appetite; and, hours awake in the early morning hours
worrying about what he and his family will do to survive if his house isn’t
rebuilt, and duration of his extreme emotional anguish has been constant,
consistent and ongoing on a daily basis since his ordeal began on the evening of
April 17, 2003, and has enveloped his very life. 

Appellants
also challenge findings of fact 134, 138, 152, 153, and 161, in which the trial
court found that $250,000.00 would fairly and reasonably compensate Lile for his emotional anguish in the past and $50,000.00
will in reasonable probability fairly and reasonably compensate Lile for the extreme and severe emotional anguish, which,
in reasonable probability, he will sustain in the future. 

         
The record contains legally and factually sufficient evidence to support the
above findings of fact.  Lile testified that he
was told by the foreman not to go in his house because they had destroyed his
foundation and his home by filling up all of the sewer lines and drain lines
with concrete.  Lile wanted to see the extent of
the damage and disregarded the foreman’s instruction; he entered his home and
found it full of standing water.  Lile was
“absolutely stunned.”  After the foreman said that they could not repair
the foundation and left the house in total disarray, Lile
was “just absolutely exasperated.  I just -- excuse me.  I almost
can’t -- can’t describe how I felt.”  Later in the testimony, he
explained,

I went ahead and
attempted to [use a broom to sweep water out of the house], but I was so
exasperated, so absolutely stunned that what I found myself doing was just --
was walking around outside of the house.  And -- And I hate to say it, you
know, it -- it’s upsetting me right now.  It upset me.  I need to
stop.

 

          It
upset me a great deal.  A great deal. . . . 

Lile
further explained,

I was going to try to
get some of that -- that water and mud and concrete out of the house.  And
what I found myself doing was walking around the outside, and as I did a while
ago, became quite upset trying to think what I was going to tell my family.

 

         
And what -- you know, a man usually tries to control his emotions, and it
didn’t work.  It didn’t work a while ago.  I was just -- and I don’t
like to admit it, but I was crying.  And for me it’s embarrassing, but --
so I was trying to figure out what -- what I was going to tell my family, my
wife and my daughter that was still at home.

 

         
And trying to determine what -- what in the world I was going to do.  And
the more I approached those, the more emotional I got about it.  And I
probably spent 45 minutes at the house just emotionally upset and emotionally
drained.  Trying to give myself enough time so I could
go back to the house and I didn’t want Charlotte and Jennifer to be aware of
that.

 

         
. . . .

 

         
You know, I was trying to do stuff [e.g., rolling the garden hoses and putting
them away]. I don’t know about other people, but when
-- when I come to that point, I try to start doing things to -- to -- not too
many times in my life have I been that emotional.  And -- And I was
extremely emotional. 

Throughout
the record, Lile testified that he was stunned and
devastated, that it was very upsetting to his family, and that it was very
upsetting to not be able to maintain his house and to have to live like
hermits.  Lile explained that he felt guilty and
embarrassed that he could not put a roof over his family.

         
In addition to the emotional problems listed above, Lile
testified that he had experienced physical problems after his house was
destroyed, including stomach problems, extremely high blood pressure, severe
heart problems, sleeplessness, dizziness, lightheadedness, and depression.
 Lile explained that he experiences extremely
high blood pressure, “especially when [he] begin[s] to get upset as [he does]
because this is in front of [him] every day, every night, 3:00 or 4:00 in the
morning.”  Lile said that he had not encountered
problems with his blood pressure, nor had he experienced dizziness, prior to
the mudjacking damage to his home.  In 2005, the
year following the mudjacking, Lile
was diagnosed with “extremely serious” health problems.  He was told that
he had “possibly six months” to live.  He lost four teeth in the years
following the mudjacking incident because he did not
have money for dental work.  Lile became upset
while he was testifying and said that he had been upset when he saw his house,
“just like I am today”; he said he was “in a lot of turmoil, still am to this
day.” 

         
Lile’s testimony constitutes “direct evidence of the
nature, duration, and severity of [his] mental anguish” and establishes “a
substantial disruption in [his] daily routine.”  See Parkway, 901 S.W.2d at 444.  Lile’s testimony revealed that he suffered from more than
just “worry and anxiety” as argued by Appellants; he experienced physical and
emotional suffering, in addition to an inability to sleep.  See CA
Partners, 274 S.W.3d at 76–77.  And he was
continuing to experience such physical and emotional suffering at the time of the
trial, with no end in the foreseeable future.  We therefore hold that the
evidence is legally sufficient to support the trial court’s award of past and
future mental anguish damages under the DTPA.  See
id. at 78
(holding evidence legally sufficient to support award of mental anguish damages
under DTPA); Carpenter, 2004 WL 306130, at *6
(holding jury’s award of mental anguish damages was supported by legally
sufficient evidence because appellants’ testimony—that problems with their
dream home’s foundation caused anxiety, embarrassment, feelings of
helplessness, recurring eye infection from the stress, sleepless nights, and
daily bouts of crying—constituted evidence that the ordeal caused a substantial
disruption of their daily lives over an extended period of time).

         
Moreover, after considering and weighing all of the evidence in the record
pertinent to the mental anguish findings, we hold that the credible evidence
supporting the finding is not so weak, or so contrary to the overwhelming
weight of all the evidence, that the findings should be set aside and a new
trial ordered.  Appellants did not present evidence contradicting Lile’s testimony.  Absent such evidence, Lile’s testimony is factually sufficient to support the
trial court’s award of past and future mental anguish damages under the DTPA.  See CA Partners, 274 S.W.3d at 78
(holding evidence factually sufficient to support award of mental anguish
damages under DTPA); Carpenter, 2004 WL
306130, at *6 (holding jury’s award of mental anguish damages was supported by
factually sufficient evidence).

         
Furthermore, in light of Lile’s testimony that he
suffered mental anguish on a daily basis from the time of the incident through
the time of trial and deferring to the trial court’s discretion in determining
the amount of mental anguish damages, we hold that the amounts awarded are
reasonable based on the frequency and duration of his mental suffering.  See
Carpenter, 2004 WL 306130, at *6.  Additionally, the mental anguish
damages are not unreasonable when compared to the other damages awarded by the
trial court.  See id.  We therefore overrule Appellants’
fourth issue.

IX.  Statute of Limitations Defense Not a Bar to Claims Against Ramon

         
In
the second issue, Ramon argues that the trial court erred by denying his
limitations defense.  Specifically, Ramon argues that Lile’s
Second Amended Petition filed January 30, 2007—which asserted claims against
Ramon in his individual capacity for the first time and was filed more than two
years after Lile’s property was damaged on April 17,
2003—did not relate back to Lile’s timely filed suit
against MBR & Associates, Inc.  Ramon’s
argument fails in light of the trial court’s finding of alter ego, which was
not challenged with regard to this issue.[10] 
Because we have upheld the trial court’s finding that Ramon is the alter ego of
MBR & Associates, Inc., the statute of
limitations was tolled as to Ramon when Lile sued MBR & Associates, Inc.  See Matthews Constr.
Co. v. Rosen, 796 S.W.2d 692, 693 (Tex. 1990)
(citing Gentry v. Credit Plan Corp., 528 S.W.2d
571, 575 (Tex. 1975), for the proposition that suit against a corporation tolls
limitations as to the alter ego of the corporation and quoting from Gentry,
“The purpose of the court in cases of this nature is to prevent use of the
corporate entity as a cloak for fraud or illegality or to work an injustice . .
. .”).  We hold that the trial court therefore did not err by denying
Ramon’s limitations defense, and we overrule Appellants’ second issue. 

X.  Calculation of Prejudgment Interest

         
In the eighth issue, Ramon argues that the trial court incorrectly calculated
the prejudgment interest as to him.  Specifically, Ramon argues that
because Lile first filed his claims against Ramon on
January 30, 2007, it is improper to award prejudgment interest dating back to
the original filing against MBR & Associates,
Inc. on June 2, 2004.[11]


         
Both parties agree that Texas Finance Code section 304.104 governs the accrual
of prejudgment interest.  Texas Finance Code section 304.104 states that
“prejudgment interest accrues on the amount of a judgment during the period
beginning on the earlier of the 180th day after the date the defendant
receives written notice of a claim or the date the suit is filed and ending on
the day preceding the date judgment is rendered.”  Tex.
Fin. Code Ann. § 304.104 (West 2006) (emphasis added).  The only
dispute is over which date should be used for the prejudgment interest on the
judgment against Ramon.

         
The statute, however, does not provide for the delayed accrual date that Ramon
seeks.  The statute specifically states that prejudgment interest accrues
on the earlier of (1) 180 days after the defendant receives notice,
which Ramon claims would be a 180 days after he was added to the suit on
January 30, 2007, or (2) “the day suit was filed,” which was June 2,
2004.  The statute does not state “the day suit was filed against the
particular defendant.”  Thus, under the statute, the June 2, 2004
date, which is clearly the earlier of the two, is the accrual date for the
prejudgment interest on the judgment against Ramon.  See id.; see
also Harris Cnty. Hosp.
Dist. v. Tomball Reg’l Hosp., 283 S.W.3d 838,
846–47 (Tex. 2009) (declining to read language into the statutes and citing Seay v. Hall, 677 S.W.2d
19, 25 (Tex. 1984) (“While this court may properly write in areas traditionally
reserved to the judicial branch of government, it would be a usurpation of our
powers to add language to a law where the legislature has refrained.”)).

         
Not only is this result proper under the previous statutory construction, the
same result is reached under the alter ego theory.  Because we held above
that MBR & Associates, Inc. is Ramon’s alter ego,
Lile’s suit against MBR
& Associates, Inc. was effectively the same as filing suit against
Ramon.  See Matthews Constr. Co., 796 S.W.2d at 692–94; Schlueter,
112 S.W.3d at 169.  Thus, under the alter ego theory, the prejudgment
interest accrues on the judgment against Ramon beginning on June 2, 2004, when
suit was filed against MBR & Associates, Inc.,
Ramon’s alter ego.  See, e.g., Hughes v. Thrash, 832 S.W.2d 779, 787–88 (Tex. App.—Houston [1st Dist.] 1992, no
writ) (holding that date prejudgment interest accrued against individual was
same as the date suit was filed against entity, even though individual was
added to suit by an amended petition seven months after the entity was sued,
because entity was an assumed name of individual).

         
Because under both statutory construction and the alter ego theory the
prejudgment interest on the judgment against Ramon begins accruing on June 2,
2004, we hold that the trial court did not err in its calculation of
prejudgment interest on the judgment against Ramon.  We overrule
Appellants’ eighth issue.

XI.  No Error in Failing to ASSIGN Liability to Others

         
In their seventh issue, Appellants argue that the trial court’s ruling that the
“designated responsible third-parties” bore no responsibility is against the
great weight and preponderance of the evidence.  Specifically, Appellants
argue that the trial court committed reversible error when it refused to find
that Appellants were not entitled to an offset in the amount of the settlement
between Lile and Baker Brothers Plumbing.

         
The record demonstrates that Lile began having
problems with his home in 2002.  Prior to the foundation issue at hand, Lile discovered black mold in his home, and the problem was
traced to leaks in the water supply lines.  Baker Brothers Rotovisions, Inc. repaired leaks in the toilets and
underneath the kitchen sink, completing the work in 2002.  After the
repairs were completed, there were no other leaks in the water supply lines. 

         
In May or June 2002, Baker Brothers discovered that the sewer lines to Lile’s home were leaking.  Baker Brothers caused the
toilet to overflow with raw sewage.  Baker Brothers caused damage to both
toilet areas, underneath the counters, the tubs, the hall, the foyer, the
laundry room, part of the master bedroom, a couple of closet areas, part of the
middle bedroom, the dining room, and the roof.  The sewage also damaged
the Sheetrock.  Baker Brothers did nothing to help Lile
clean up the mess that they had caused.  Lile
later sued Baker Brothers for the damage caused by the sewage and ultimately
settled with them for $8,000.

         
In June or July 2002, it was discovered that the foundation had moved as a
result of the leaking sewer lines and that the sewer lines needed to be
replaced. So in August 2002, Steven Thomas Lux, a master plumber who was referred by Power Jack
Foundation Company, started the sewer line replacement; he did not, however,
jackhammer any holes in Lile’s foundation.  When
Lux completed the replacement of the sewer line, Lile observed Lux conduct a
hydrostatic test on the line, which showed that there were no leaks or cracks
in the line. 

         
In March 2003, ASAP Containment, a mold remediation company, removed carpeting,
Sheetrock, some kitchen cabinets, and some of the ceiling in several rooms in
order to rid the home of mold.  ASAP also repaired the
roof.  At that point, all of the water leaks had been repaired, the
sewer system had been replaced, and the mold remediation had been completed.

         
Lile testified that after ASAP Containment had
completed structural remediation and prior to MBR’s
starting work on Lile’s home, there were no holes
punched through the slab of the interior of the foundation.  There were
also no tunnels under the house; Lux and his crew had
filled them when they replaced the sewer lines.  Lile
further testified that he had never had any mudjacking
work done on his home prior to the day that MBR
started its work.  After MBR put mudjacking cement in Lile’s sewer
system, no one else came and did any mudjacking work
on Lile’s home. 

         
The trial court found that Baker Brothers and the other providers listed above
did not commit any act, omission, or other conduct in performing services for Lile that caused or contributed to causing any damages or
harm that Lile sustained as a result of Appellants’
conduct.

         
Based on the record, there is no evidence that any other person or entity was
responsible for the mudjacking damage caused by
Appellants.  As set forth above, no other person or entity performed mudjacking work on Lile’s home,
and thus no other person or entity contributed to cause the damages Lile sustained as a result of the mudjacking
performed by Appellants.  Moreover, Appellants’ attempt to receive an
offset in the amount of the settlement between Lile
and Baker Brothers fails not only because there is no evidence to support it
but also because Baker Brothers was no longer a party to the suit at the time
of the trial; the trial court had entered an order striking Appellants’
cross-claims against Baker Brothers, and Appellants failed to challenge the
order.  And because Appellants never obtained an order on their motion to
add Lux and Mendoza as responsible third parties and
never challenged the order striking their counterclaims against Lux and Mendoza, the only parties in the case at the time
of the trial were MBR & Associates, Inc.; Ramon;
and Lile.  See generally Tex. Civ. Prac. & Rem. Code Ann.
§ 33.003(a) (West 2008) (stating that “trier of fact . . . shall determine
the percentage of responsibility . . . for . . . each responsible third party
who has been designated under Section 33.004”).  We therefore hold that
the evidence is legally and factually sufficient to support the trial court’s
findings of fact 210, 211, 212, 213, and 214, which find that other service
providers are not responsible as third parties for the damages resulting from
the mudjacking performed by Appellants.  We
overrule Appellants’ seventh issue.

XII.  No Need to Remand to Reconsider Exemplary Damages

         
Because we have held that there is sufficient evidence to support the trial
court’s findings of fact that were challenged above by Appellants and because
we have not modified the judgment to delete any of the damages awarded by the
trial court, we need not reach Appellants’ ninth issue in which they argue that
remand is necessary to reconsider exemplary damages in the event we modify the
judgment.  See Tex. R. App. P. 47.1 (stating that appellate court
need only address every issue necessary for final disposition of the appeal).

XIII.  Conclusion

         
Having overruled each of Appellants’ issues necessary for final disposition of
the appeal, we affirm the trial court’s judgment.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
DAUPHINOT, WALKER, and MCCOY, JJ.

 

DELIVERED:  October 4,
2012  

 

 



 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.
02-11-00431-CV

 

 


 
 
 MBR & Associates, Inc. and Marion
 Brian Ramon
  
 v.
  
  
 William
 S. Lile
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From
 the 352nd District Court
  
 of
 Tarrant County (352-206376-04)
  
 October
 4, 2012
  
 Opinion
 by Justice Walker
 
 


 

JUDGMENT

 

         
This court has considered the record on appeal in this case and holds that
there was no error in the trial court’s judgment.  It is ordered that the
judgment of the trial court is affirmed. 

         
It is further ordered that appellant MBR &
Associates, Inc. and Marion Brian Ramon shall pay all of the costs of this
appeal, for which let execution issue.

SECOND DISTRICT COURT OF APPEALS 

 

 

By_________________________________

   
Justice Sue Walker

 














[1]See
Tex. R. App. P. 47.4.





[2]The
trial court found that MBR-GFR
was a trade name used by Ramon individually.





[3]MBR-GFR is not reflected as an
Appellant in the style of this case.  The trial court found that “MBR & Associates, Inc. was held out to the public and Lile as the entity responsible for and controlling MBR-GFR, when in reality Ramon
was operating and controlling both entities, while hiding the truth from Lile” and that “MBR &
Associates, Inc. and Ramon doing business as MBR-GFR, are one and the same and that’s the way Ramon treated
them.” 





[4]Appellants’
nine issues are as follows:

1.      
What is the proper measure of damages when the cost
                    to
repair real property exceeds the value of the property
                    itself?

         
a.       Is cost of repair the proper measure of
damages
                              when
the undisputed evidence shows that repairs
                              are
economically unfeasible?

         
b.       Is loss of use the proper measure of
damages for
                              permanent
injury to real property?

2.      
Did the trial court err in denying, as a matter of law,
                    Marion
Brian Ramon’s affirmative defense of limitations?

3.      
Did the Plaintiff suffer the type of injury for which mental
                    anguish
damages are recoverable?

4.      
Did the Plaintiff present sufficient evidence to support
                    the
award of past and future mental anguish?

5.      
Are the trial court’s vicarious liability findings supported
                    by
sufficient evidence?

         
a.       Did the Plaintiff present sufficient
evidence that
                              MBR & Associates, Inc. is the alter ego of Marion
                              Brian
Ramon?

         
b.       Did the Plaintiff present sufficient
evidence that
                              either
Frank Creed or Justin Bryant was the agent
                             
of Marion Brian Ramon?

6.      
Did the Plaintiff present sufficient evidence of proximate
                    cause
to support his fraud or DTPA claims?

7.      
Did the trial court err in concluding that no responsible
                    third
parties were liable for Plaintiff’s damages?

8.      
Did the trial court miscalculate pre-judgment interest as
                    to
Marion Brian Ramon?

9.      
Is remand for a new hearing on exemplary damages
                    appropriate
in the event this Court reduces the amount
                    of
the Plaintiff’s actual damages? 





[5]This
total consists of $105,864.00, which the parties stipulated was the cost to
repair the interior of Lile’s house; $38,000.00 to
repair the sewer lines, less $11,394.96, which Lile
had available for buildback that never took place due
to Appellants’ conduct.





[6]In
his brief, Lile relied on Hennen
v. McGinty, 335 S.W.3d 642 (Tex. App.—Houston
[14th Dist.] 2011), which was overruled after his brief was filed.  See
McGinty v. Hennen, 372 S.W.3d 625, 629 (Tex. 2012).  In McGinty, the trial court held that the evidence was
legally insufficient to support the jury’s finding that $651,230.72 was a
reasonable and necessary cost to repair Hennen’s home
and that Hennen did not produce evidence of the
difference in market value as of the date of closing.  Id.
at 626.  Here, as discussed below, Appellants failed to timely
challenge the reasonableness of Lile’s cost of repair
damages, and Lile did not pursue diminution in value
damages.  Thus, McGinty is
distinguishable from the case before us.





[7]Appellants
in their reply brief also challenge for the first time on appeal whether there
was evidence that the repairs were economically feasible, arguing that “the
only testimony regarding the economic feasibility of repairs compels a
rejection of the award for cost of repairs based upon the economic waste rule.” However, an issue raised for the first time in a reply
brief is ordinarily waived and need not be considered by this court.  See
McAlester Fuel Co. v. Smith Int’l, Inc., 257 S.W.3d 732, 737 (Tex.
App.—Houston [1st Dist.] 2007, pet. denied); see also City of San Antonio v.
Schautteet, 706 S.W.2d
103, 104 (Tex. 1986) (noting that appellate court should not have addressed
issues raised for first time in reply brief on appeal).  Moreover,
Appellants did not object, but rather stipulated, to the $105,864.00 cost to
repair the interior of Lile’s house.  See,
e.g., Weitzel v. Barnes, 691 S.W.2d
598, 601 (Tex. 1985) (stating that there was no objection to reasonableness and
necessity when trial judge admitted into evidence plaintiff’s exhibit reflecting
cost of repairs and holding that error, if any, had been waived by failure to
make a proper objection).





[8]The
judgment awards Lile $150,000 from MBR & Associates, Inc. and $150,000 from Ramon.
 The findings of fact state that this amount is assessed as exemplary
damages based on the gross negligence, fraud, and knowing and intentional
conduct under the DTPA. 





[9]Ramon
testified that a licensed plumber and an engineer were not on site when the
work on Lile’s home started. 





[10]Appellants’
supplemental brief does not challenge any finding of fact relating to this
issue.





[11]In
their postsubmission brief, Appellants challenge
conclusion of law 31 in connection with this issue.  Conclusion of law 31
states only that “Lile is entitled to prejudgment
interest on his damages at the rate of five percent (5%) per annum, against MBR & Associates, Inc. and Ramon, jointly and severally . . . .”  It does not,
however, set forth the date on which the prejudgment interest accrues.